

1  SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
   Alan R. Plutzik, Of Counsel (Bar No. 077758)
2  L. Timothy Fisher, Of Counsel (Bar No. 191626)
   2125 Oak Grove Road, Suite 120
3  Walnut Creek, CA 94598
   Telephone: (925) 945-0770
4  Facsimile: (925) 945-8792

5

   *Attorneys for Plaintiffs*
6

7  [Additional Counsel Appear on Signature Page]

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10

   KIMBERLY D. HOLT, Individually and On Behalf    )
11 of All Others Similarly Situated,               )
                                                   )  **CIVIL ACTION NO.**
12                                                 )  **C08-01806**   **S C**
                       Plaintiff,                  )
13                                                 )
                                                   )  CLASS ACTION COMPLAINT
14         vs.                                     )
                                                   )
15                                                 )
   THE PMI GROUP, INC., L. STEPHEN SMITH,          )  **JURY TRIAL DEMANDED**
16 DAVID H. KATKOV and DONALD P. LOFE,             )
   JR.,                                            )
17                                                 )
                                                   )
18                     Defendants.                 )
   _____)

19         Plaintiff, Kimberly D. Holt ("Plaintiff"), alleges the following based upon the investigation

20 by Plaintiff's counsel, which included, among other things, a review of the defendants' public

21 documents, conference calls and announcements made by defendants, United States Securities and

22 Exchange Commission ("SEC") filings, wire and press releases published by and regarding The PMI

23 Group, Inc. ("PMI" or the "Company"), securities analysts' reports and advisories about the

24 Company, and information readily available on the Internet, and Plaintiff believes that substantial

25 additional evidentiary support will exist for the allegations set forth herein after a reasonable

26 opportunity for discovery.

27

28

1

2

## NATURE OF THE ACTION AND OVERVIEW

3    1.    This is a federal class action on behalf of purchasers of PMI's securities between
4    November 2, 2006 and March 3, 2008, inclusive (the "Class Period"), seeking to pursue remedies
5    under the Securities Exchange Act of 1934 (the "Exchange Act").

6    2.    PMI provides credit, capital, and risk transfer services. Through its wholly and
7    partially owned subsidiaries, PMI offers residential mortgage insurance and credit enhancement
8    products, financial guaranty insurance, and financial guaranty reinsurance. One such entity that PMI
9    has an equity stake in is Financial Guaranty Insurance Company ("FGIC"), which is an insurance
10   holding company whose wholly owned subsidiary, Financial Guaranty Insurance Corporation,
11   provides credit enhancement on infrastructure finance and structured finance securities worldwide.
12   FGIC typically guarantees the scheduled payments of principal and interest on an issuer's obligation.

13   3.    Beginning in July 2007 and continuing through the end of the Class Period, the
14   Company began to issue a series of disclosures, where it acknowledged its exposure to anticipated
15   losses and defaults related to the housing and credit crisis. According to PMI, those losses and
16   defaults were caused by the Company's failure to engage in proper underwriting practices.
17   Additionally, PMI announced losses that were related to large increases in defaults and its
18   investment in FGIC (as FGIC was experiencing severe problems because of the housing and credit
19   crisis). At the same time, ratings agencies such as Fitch Ratings downgraded the Company's stock.

20   4.    By October 2007, Standard & Poor's announced that it placed PMI on negative
21   CreditWatch with negative implications. Throughout this time, the Company continued to make
22   denials and misrepresentations about the true nature of its finances and prospects, even as the
23   artificially inflated price of its stock began a slow but steady decline.

24   5.    On March 3, 2008, the Company shocked investors when it announced that its 2007
25   Annual Report would be filed late, and that the Company's U.S. Mortgage Insurance Operations had
26   reported a net loss of $236 million in the fourth quarter. The Company's quarterly loss was the
27   result of an increase in default inventory, higher claim rates and higher average claim sizes.
28   Additionally, the Company reported that its Federal Guarantee segment would report a significant

1   net loss for the fourth quarter and full year 2007, driven by equity losses of FGIC, which resulted

2   from unrealized mark-to-market losses and loss adjustment expenses at FGIC. The Company further

3   disclosed that it was still trying to determine whether the value of its investment in FGIC was

4   impaired as of December 31, 2007. That same day, the Company filed a Form 12b-25 with the SEC,

5   wherein it revealed that it was unable to file its Annual Report for 2007 on time.   The Company

6   stated that it was awaiting financial information from FGIC that was necessary in order for the

7   Company to complete its financial statements.

8        6.      Upon the release of this news, the Company's shares declined $0.35 per share, or 5.16

9   percent, to close on March 4, 2008 at $6.43 per share, on unusually heavy trading volume.  During

10  the Class Period, the Company's shares closed as high as $50.07 per share.

11       7.      The Complaint alleges that, throughout the Class Period, defendants failed to disclose

12  material adverse facts about the Company's financial well-being, business relationships, and

13  prospects.  Specifically, defendants failed to disclose or indicate the following: (1) that FGIC had

14  exposure to defaults on mortgage-backed securities and was materially impaired as a result; (2) that

15  the Company failed to properly account for its investment in FGIC and in doing so overstated its

16  financial results; (3) that the Company engaged in improper underwriting practices in its book of

17  business related to insurance; (4) that the Company had far greater exposure to defaults and losses in

18  regard to its book of business related to insurance than it disclosed; (5) that the Company would have

19  to stop writing insurance policies to borrowers, which would have a negative result on future

20  business; (6) that the Company's financial statements were not prepared in accordance with

21  Generally Accepted Accounting Principles ("GAAP"); (7) that the Company lacked adequate

22  internal and financial controls; and (8) that, as a result of the foregoing, the Company's statements

23  about its financial well-being and future business prospects were lacking in any reasonable basis

24  when made.

25       8.      As a result of defendants' wrongful acts and omissions, and the precipitous decline in

26  the market value of the Company's securities, Plaintiff and other Class Members have suffered

27  significant losses and damages.

28

1

2                                  **JURISDICTION AND VENUE**

3          9.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the

4    Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R.

5    § 240.10b-5).

6

7          10.     This Court has jurisdiction over the subject matter of this action pursuant to Section

8    27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

9          11.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act,

10   15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).   Many of the acts and transactions alleged herein,

11   including the preparation and dissemination of materially false and misleading information, occurred

12   in substantial part in this Judicial District.   Additionally, PMI's principal executive offices are

13   located within this Judicial District.

14         12.     In connection with the acts, conduct and other wrongs alleged in this Complaint,

15   defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

16   including but not limited to, the United States mails, interstate telephone communications and the

17   facilities of the national securities exchange.

18                                        **PARTIES**

19         13.     Plaintiff, Kimberly D. Holt, as set forth in the accompanying certification,

20   incorporated by reference herein, purchased PMI's securities at artificially inflated prices during the

21   Class Period and has been damaged thereby.

22         14.     Defendant PMI is a Delaware corporation with its principal executive offices located

23   at 3003 Oak Road, Walnut Creek, California.

24         15.     Defendant L. Stephen Smith ("Smith") was, at all relevant times, the Company's Chief

25   Executive Officer ("CEO"), and Chairman of the Board of Directors.

26         16.     Defendant David H. Katkov ("Katkov") was, at all relevant times, the Company's

27   Executive Vice President.

28         17.     Defendant Donald P. Lofe, Jr. ("Lofe") was, at relevant times, the Company's Chief

                              CLASS ACTION COMPLAINT

1  Financial Officer ("CFO") and Executive Vice President.

2  18.    Defendants Smith, Katkov and Lofe are collectively referred to hereinafter as the

3  "Individual Defendants." The Individual Defendants, because of their positions with the Company,

4  possessed the power and authority to control the contents of PMI's reports to the SEC, press releases

5  and presentations to securities analysts, money and portfolio managers and institutional investors,

6  i.e., the market. Each defendant was provided with copies of the Company's reports and press

7  releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability

8  and opportunity to prevent their issuance or cause them to be corrected. Because of their positions

9  and access to material non-public information available to them, each of these defendants knew that

10  the adverse facts specified herein had not been disclosed to, and were being concealed from, the

11  public, and that the positive representations which were being made were then materially false and

12  misleading. The Individual Defendants are liable for the false statements pleaded herein, as those

13  statements were each "group-published" information, the result of the collective actions of the

14  Individual Defendants.

15  ## SUBSTANTIVE ALLEGATIONS

16  ### Background

17  19.    PMI provides credit, capital, and risk transfer services. Through its wholly and

18  partially owned subsidiaries, PMI offers residential mortgage insurance and credit enhancement

19  products, financial guaranty insurance, and financial guaranty reinsurance. PMI has operations in

20  Asia, Australia and New Zealand, Canada, Europe, and the United States.

21  20.    Financial Guaranty Insurance Company ("FGIC") is an insurance holding company

22  whose wholly owned subsidiary, Financial Guaranty Insurance Corporation, provides credit

23  enhancement on infrastructure finance and structured finance securities worldwide. FGIC typically

24  guarantees the scheduled payments of principal and interest on an issuer's obligation. PMI owns a

25  42% equity ownership interest in FGIC.

26

27

28

**Materially False and Misleading**
**Statements Issued During the Class Period**

21.    The Class Period begins on November 2, 2006.  On this day, the Company issued a press release entitled "The PMI Group, Inc. Reports Third Quarter 2006 Net Income of $104.2 Million, or $1.16 per Diluted Share."  Therein, the Company, in relevant part, stated:

> The PMI Group, Inc. (NYSE: PMI) (the "Company") today reported net income of $104.2 million for the third quarter of 2006 compared to net income of $95.7 million for the third quarter of 2005. Net income per diluted share grew by approximately 20 percent to $1.16 for the third quarter of 2006 compared to $0.97 for the third quarter of 2005. The increase was due to improved performance in all business segments of the Company's operations, a reduced number of common shares outstanding and a favorable comparison with the third quarter of 2005 when the Company's equity earnings from FGIC were adversely impacted by Hurricane Katrina.

> **Highlights in the third quarter of 2006 include:**

> - *U.S. Mortgage Insurance Operations — solid growth in premiums written, premiums earned, average premium rate and net investment income as well as increased persistency and continued expense reductions from field office restructurings;*

> - International Operations— PMI Australia reported record net income along with solid growth in premiums earned and net investment income while also strengthening loss reserves. PMI Europe grew net premiums written, new insurance written and insurance in force as well as continued expansion of PMI's European presence;

> - Financial Guaranty — *FGIC reported strong premium earnings, increased net investment income and favorable credit performance;*

> - *Common Share Repurchases — the Company entered into an accelerated stock buyback program pursuant to which it will purchase common stock for an aggregate purchase price of $345 million. The maximum number of shares to be repurchased under the program has been set at 8.2 million common shares and the minimum number has been set at 7.2 million representing a purchase price range per common share from $41.88 to $47.99, respectively.*

The actual number of shares received and the average per share cost will depend on the weighted average share price of common stock over the period of the program which will terminate no later than April 2007. In the third quarter of 2006, the Company received the minimum allotment of approximately 7.2 million common shares. The Company will receive additional common shares at the program's expiration to the extent the Company's weighted average common share net price does not exceed $47.99 during the program. During the third quarter of 2006, the Company also entered into a Rule 10b5-1 Plan for the purchase of up to $40 million of additional common shares.

- New Revolving Credit Facility – the Company entered into a new five-year $400 million revolving credit facility with a consortium of lenders. The facility may be expanded up to $500 million with the approval of the lenders.

- Book value per share ended the third quarter at $39.14, an increase of approximately 10% from third quarter of 2005.

**Consolidated Operating Results**

Consolidated net premiums written for the third quarter and year to date totaled $212.4 million and $626.1 million, respectively, compared to $206.1 million and $599.6 million for the same periods one year ago. The increases, on a year over year comparison, were due primarily to an increase in average premium rates and average insured loan balances in U.S. Mortgage Insurance Operations and higher new insurance written in PMI Australia.

Consolidated premiums earned for the third quarter and year to date were $214.9 million and $634.8 million, respectively, compared to $205.1 million and $611.0 million for the same periods one year ago. The increases, on a year over year comparison, were due to higher average premium rates, higher new insurance written, insurance in force growth and a release of unearned premiums on terminated policies in PMI Australia, and higher average premium rates and loan sizes in U.S. Mortgage Insurance Operations.

Consolidated other underwriting and operating expenses for the third quarter and year to date were $56.2 million and $169.6 million, respectively, compared to $54.5 million and $154.6 million for the same periods one year ago. The increases in the third quarter and first nine months of 2006, compared to the same periods in 2005, were due primarily to stock option and employee stock purchase plan related expenses, partially offset by savings from field office restructurings in U.S. Mortgage Insurance Operations.

CLASS ACTION COMPLAINT

Consolidated losses and loss adjustment expenses for the third quarter and year to date were $79.6 million and $212.4 million, respectively, compared to $61.3 million and $193.0 million in the same periods last year. The increase in the third quarter of 2006, compared to the same period in 2005, was primarily a result of loss reserve additions and an increase in claims paid in U.S. Mortgage Insurance Operations, PMI Australia and, to a lesser extent, PMI Europe. The increase in the first nine months of 2006 compared to the same period in 2005 was due primarily to reserve additions and an increase in paid claims in PMI Australia and PMI Europe.

Consolidated reserve for losses and loss adjustment expenses totaled $394.2 million as of September 30, 2006 compared to $384.6 million as of June 30, 2006 and $366.3 million as of September 30, 2005. Loss reserves in U.S. Mortgage Insurance Operations increased $3.0 million in the third quarter of 2006, compared to second quarter of 2006, primarily due to higher expected claim rates and claim sizes. PMI Australia's reserve for losses increased $6.1 million in the third quarter, compared to the second quarter of 2006, primarily due to an increase in delinquent loans, and higher expected average claim sizes and claim rates. [Emphasis added, footnotes omitted.]

22.    On February 5, 2007, the Company issued a press release entitled "The PMI Group, Inc. Reports Record 2006 Net Income of $419.7 Million, or $4.57 Per Diluted Share; Fourth Quarter 2006 Net Income of $100.5 Million, or $1.19 Per Diluted Share." Therein, the Company, in relevant part, stated:

*The PMI Group, Inc. (NYSE: PMI) (the "Company") today reported record net income for the full year 2006 of $419.7 million compared to $409.2 million in 2005. Net income per diluted share for the full year of 2006 rose 11.5% to $4.57 compared to $4.10 per share one year ago. Net income for the fourth quarter of 2006 was $100.5 million, or $1.19 per diluted share, compared to net income in the fourth quarter of 2005 of $107.7 million, or $1.11 per diluted share.*

The Company ended 2006 with a book value of $41.14 per share compared to $36.42 at the end of 2005, representing an increase of approximately 13%.

Highlights include:

- *U.S. Mortgage Insurance Operations — primary insurance in force grew to $102.6 billion and the persistency rate increased to 69.6%. Incurred losses for the year were approximately $263 million, consistent with the Company's guidance;*

- 8 -

CLASS ACTION COMPLAINT

- International Operations — PMI Australia had substantial growth in net premiums written driven by insurance in force growth. Fourth quarter results include an increase in incurred losses due to a normalization of credit performance in Australia. PMI Europe reported record net income along with solid growth in new insurance written. PMI's European presence continued to expand;

- Financial Guaranty — equity earnings from FGIC grew as a result of strong premium earnings, increased net investment income;

- Capital Events — the Company repurchased approximately 907,000 common shares in the fourth quarter for $40 million. For the full year, the Company has retired approximately 11.4 million common shares at a cost of approximately $535 million. Inclusive within the $535 million cost, the Company expects to receive additional common shares under its accelerated stock buyback program by no later than the second quarter of 2007. The Company had 84.5 million diluted weighted average common shares outstanding in the fourth quarter of 2006, a 14.7 million decrease from the fourth quarter 2005.

- In the fourth quarter of 2006, the Company recognized a one-time pension settlement charge of $4.0 million after tax, a $1.2 million benefit from an after tax reversal related to the Baynham settlement and costs of $0.8 million after tax to exchange and extinguish debt.

- Book value per share as of December 31, 2006 was $41.14, an increase of approximately 13% from the prior year.

Consolidated Operating Results

Consolidated net premiums written for the fourth quarter and full year totaled $235.5 million and $861.6 million, respectively, compared to $246.1 million and $845.7 million for the same periods one year ago. The year over year increase was due primarily to an increase in average premium rates and average insured loan balances in U.S. Mortgage Insurance Operations and higher new insurance written in the International segment from PMI Australia and PMI Europe.

Consolidated premiums earned for the fourth quarter and full year were $225.7 million and $860.5 million, respectively, compared to $206.6 million and $817.6 million for the same periods one year ago. The increases in 2006 were due to insurance in force growth, higher average premium rates and loan sizes in U.S. Mortgage Insurance Operations and insurance in force growth in PMI Australia.

CLASS ACTION COMPLAINT

Consolidated losses and loss adjustment expenses for the fourth quarter and full year were $90.5 million and $302.9 million, respectively, compared to $64.8 million and $257.8 million in the same periods last year. The increases in 2006 were primarily a result of loss reserve additions in U.S. Mortgage Insurance Operations and an increase in total incurred losses in PMI Australia. The incurred losses increase for PMI Australia was driven principally by increases in claim rates and severity.

Consolidated other underwriting and operating expenses for the fourth quarter and full year were $68.7 million and $235.8 million, respectively, compared to $59.1 million and $213.6 million for the same periods one year ago. The increases in 2006 were due primarily to our adoption of SFAS 123R and the resulting expenses for stock options and stock based compensation and a pension settlement charge related to a lump-sum distribution from the Supplemental Employee Retirement Plan.

Consolidated reserve for losses and loss adjustment expenses totaled $414.7 million as of December 31, 2006 compared to $394.2 million as of September 30, 2006 and $368.8 million as of December 31, 2005. Loss reserves in U.S. Mortgage Insurance Operations increased $7.4 million in the fourth quarter of 2006 primarily due to higher expected claim rates and claim sizes. PMI Australia's reserve for losses and LAE increased $12.4 million in the fourth quarter primarily due to higher expected claim rates and severity and, to a lesser extent, an increase in the number of delinquent loans. [Emphasis added, footnotes omitted.]

23.    Also on February 5, 2007, the Company issued a press release entitled "The PMI Group, Inc. Issues 2007 Financial Guidance." Therein, the Company, in relevant part, stated:

The PMI Group, Inc. (NYSE: PMI) (the "Company") today issued the following financial guidance for 2007:

- *Total incurred losses for its U.S. Mortgage Insurance Operations to be between $280 million to $305 million;*

- *Expense ratio for its U.S. Mortgage Insurance Operations to be between 21% and 24%;*

- Consolidated investment portfolio pre-tax yield to be between 5.00% and 5.50%;

- Full year expenses related to stock options and stock based compensation to be between $13 million to $15 million after tax;

CLASS ACTION COMPLAINT

- Consolidated tax rate to be between 25% and 27%. [Emphasis added.]

24.    On April 30, 2007, the Company issued a press release entitled "The PMI Group, Inc. Reports First Quarter 2007 Net Income of $102.0 Million, or $1.16 Per Diluted Share." Therein, the Company, in relevant part, stated:

> **The PMI Group, Inc. (NYSE: PMI) (the "Company") today reported net income for the first quarter of 2007 of $102.0 million compared to net income in the first quarter of 2006 of $105.3 million.** Diluted net income per share grew by approximately six percent to $1.16 for the first quarter of 2007 compared to $1.09 for the first quarter of 2006 and was positively influenced by the Company's redemption of its 2.5% Senior Convertible Debentures in October 2006.
>
> **The Company ended the first quarter of 2007 with a book value of $42.21 per share compared to $37.24 at the end of the first quarter of 2006, representing an increase of approximately 13%.**
>
> **Highlights include:**
>
> - **U.S. Mortgage Insurance Operations — achieved record total revenues driven by strong growth in net premiums written and earned, and grew primary insurance in force to $106.9 billion. Net premiums written and net premiums earned in the first quarter of 2007 increased approximately 20% and 16%, respectively, compared to the same period one year ago;**
>
> - International Operations — PMI Australia had solid growth in net premiums written driven by insurance in force growth of 27%, compared to the first quarter 2006, to end at $156.7 billion. PMI Europe reported strong growth in net premiums written of approximately 24% compared to the first quarter of 2006;
>
> - **Financial Guaranty — equity in earnings from FGIC grew by 34% to $29.3 million compared to the first quarter of 2006 as a result of strong premium earnings, increased net investment income and a favorable impact to tax expense from a reduction of contingent tax reserves;**
>
> - Capital Events — the Company repurchased approximately 325,000 common shares for approximately $14 million. The Company's accelerated stock buyback program is expected to be completed in the second quarter of 2007.

**Consolidated Operating Results**

Consolidated net premiums written for the first quarter of 2007 totaled $244.1 million compared to $201.9 million for the same period one year ago. The year over year increase was primarily due to an increase in new insurance written, improved persistency, higher average premium rates and higher average insured loan balances in U.S. Mortgage Insurance Operations and an increase in net premiums written in PMI Australia.

Consolidated premiums earned for the first quarter of 2007 were $236.4 million compared to $206.2 million for the same period one year ago. The increase in the first quarter of 2007 was due to insurance in force growth, higher average premium rates and loan sizes in U.S. Mortgage Insurance Operations and insurance in force growth in PMI Australia.

***Consolidated losses and loss adjustment expenses for the first quarter of 2007 were $109.3 million compared to $60.9 million in the same period last year. The increase in first quarter of 2007 was primarily a result of higher incurred losses in U.S. Mortgage Insurance Operations and PMI Australia. The incurred losses increase in U.S. Mortgage Insurance Operations was a result of an increase in claim size and claim rates while the increase in PMI Australia was due to higher claim sizes and an increase in the number of delinquent loans.***

Consolidated other underwriting and operating expenses for the first quarter of 2007 were $62.7 million compared to $58.6 million for the same period one year ago. The increase in the first quarter of 2007 was due primarily to higher stock option expense charges.

***Consolidated reserve for losses and loss adjustment expenses totaled $443.0 million as of March 31, 2007 compared to $414.7 million as of December 31, 2006 and $369.9 million as of March 31, 2006. Loss reserves in U.S. Mortgage Insurance Operations increased $19.9 million in the first quarter of 2007 primarily due to lower default cure rates and higher claim sizes.*** PMI Australia's reserve for losses and LAE increased $7.8 million in the first quarter of 2007 primarily due to an increase in the number of delinquent loans. [Emphasis added, footnotes omitted.]

25.    Also on April 30, 2007, the Company issued a press release entitled "The PMI Group, Inc. Updates 2007 Financial Guidance." Therein, the Company, in relevant part, stated:

The PMI Group, Inc. (NYSE: PMI) (the "Company") today updated its financial guidance for 2007:

CLASS ACTION COMPLAINT

- *Total incurred losses for its U.S. Mortgage Insurance Operations to be between $300 million to $360 million;*

- *Expense ratio for its U.S. Mortgage Insurance Operations to be between 20% and 23%;*

- Consolidated investment portfolio pre-tax yield to be between 5.00% and 5.50%;

- Full year expenses related to stock options and share-based compensation to be between $13 million to $15 million after tax;

- Consolidated tax rate to be between 25% and 27%. [Emphasis added.]

26.    On July 31, 2007, the Company issued a press release entitled "The PMI Group, Inc. Reports Second Quarter 2007 Net Income of $83.8 Million, or $0.95 Per Diluted Share." Therein, the Company, in relevant part, stated:

> *The PMI Group, Inc. (NYSE: PMI) (the "Company") today reported net income for the second quarter of 2007 of $83.8 million, or $0.95 per diluted share. Net income for the second quarter of 2006 was $109.6 million, or $1.14 per diluted share. The decline in net income for the second quarter of 2007 was primarily due to a $58.7 million increase in loss reserves and higher claims paid in U.S. Mortgage Insurance Operations, partially offset by increases in net income from International Operations and Financial Guaranty.*
>
> The Company ended the second quarter of 2007 with a book value of $43.46 per share compared to $38.11 at the end of the second quarter of 2006, representing an increase of approximately 14%.
>
> Highlights include:
>
> - *U.S. Mortgage Insurance Operations — Net income was $41.5 million in the second quarter of 2007. Losses and loss adjustment expenses increased to $134.4 million as a result of increases in notices of default, claim rates and claim sizes. Total revenues in the second quarter of 2007 increased by approximately 13% driven by strong growth in net premiums written and earned. Net premiums written and net premiums earned in the second quarter of 2007 increased by approximately 19% and 16%, respectively, compared with the same period one year ago. Insurance in force at the end of the second quarter of 2007 was $111.7 billion, representing an 11% increase from one year ago.*

- International Operations — PMI Australia had solid growth in net premiums written and grew their insurance in force to $172.9 billion. Total losses and loss adjustment expenses decreased in the second quarter of 2007 from the first quarter resulting in a loss ratio of 25.2% for the period and 34.4% for the first six months of 2007. PMI Europe reported strong growth in net premiums written of approximately 66% compared with the second quarter of 2006 driven particularly by flow business in Italy.

- ***Financial Guaranty — equity in earnings from FGIC were $27.4 million (pre-tax), an increase of 10% compared with the second quarter of 2006, as a result of strong premium earnings, a significant recovery related to a Hurricane Katrina impacted credit, a release of certain tax contingencies and increased net investment income, partially offset by mark to market adjustments in certain mortgage related CDO's due principally to widening credit spreads.***

- Capital Events — The Company repurchased 468,500 common shares for approximately $23 million in the second quarter of 2007. The Company also completed its accelerated stock buyback program in the second quarter of 2007 with the final delivery of 436,152 common shares. In July 2007, the Company announced an additional $150 million authorization to its existing common share repurchase program which brings total current authorizations to $300 million.

**Consolidated Operating Results**

Consolidated net premiums written for the second quarter and first half of 2007 totaled $256.0 million and $500.0 million, respectively, compared with $211.8 million and $413.7 million for the same periods one year ago. The year over year increases were primarily due to an increase in new insurance written, improved persistency, higher average primary premium rates and higher average insured loan balances in U.S. Mortgage Insurance Operations and an increase in net premiums written combined with favorable foreign exchange rates in PMI Australia.

Consolidated premiums earned for the second quarter and first half of 2007 were $242.3 million and $478.7 million, respectively, compared with $213.6 million and $419.9 million for the same periods one year ago. The increases were due to insurance in force growth, higher average premium rates and larger loan sizes in U.S. Mortgage Insurance Operations.

Consolidated losses and loss adjustment expenses for the second quarter and first half of 2007 were $146.2 million and $255.5 million, respectively, compared with $71.9 million and $132.8 million from the same periods last year. The increases were primarily a result of higher incurred losses in U.S. Mortgage Insurance Operations as a result of an increase in notices of default, claim size and claim rates.

Consolidated other underwriting and operating expenses for the second quarter and first half of 2007 were $59.8 million and $122.5 million, respectively, compared with $52.9 million and $113.4 million for the same periods one year ago. The increases were primarily due to growth of the International Operations combined with changes in foreign exchange rates.

Consolidated reserve for losses and loss adjustment expenses totaled $507.0 million as of June 30, 2007 compared with $443.0 million as of March 31, 2007 and $384.6 million as of June 30, 2006. Reserves for losses and loss adjustment expenses (LAE) in U.S. Mortgage Insurance Operations increased $58.7 million in the second quarter of 2007 primarily due to an increase in notices of default, increased claim rates and larger claim sizes. PMI Australia's reserve for losses and LAE increased $2.8 million in the second quarter of 2007 due to a higher default inventory. [Emphasis added, footnotes omitted.]

27.    Also on July 31, 2007, the Company issued a press release entitled "The PMI Group, Inc. Updates 2007 Financial Guidance." Therein, the Company, in relevant part, stated:

The PMI Group, Inc. (NYSE: PMI) (the "company") today updated its financial guidance for 2007:

- *Paid claims, loss adjustment expenses and additions to the reserve for losses (collectively "total incurred losses") for its U.S. Mortgage Insurance Operations to be between $450 million to $550 million;*

- *Expense ratio for its U.S. Mortgage Insurance Operations to be between 20% and 23%;*

- Consolidated investment portfolio pre-tax yield to be between 5.00% and 5.50%;

- Full year expenses related to stock options and share-based compensation to be between $13 million to $15 million after tax;

- Consolidated tax rate to be between 19% and 22%. [Emphasis added.]

28.    On August 29, 2007, the Company issued a press release entitled "The PMI Group,

CLASS ACTION COMPLAINT

1  Inc. Comments on Fitch Revisions to U.S. Mortgage Insurance Capital Model and Ratings Actions."

2  Therein, the Company, in relevant part, stated:

3      *The PMI Group, Inc. (NYSE: PMI) announced today that
        consistent with its revisions of its capital model for U.S. mortgage*
4      *insurance companies, Fitch Ratings (Fitch) has changed the
        insurer financial strength ratings for PMI Mortgage Insurance Co.*
5      *and PMI Guaranty Co. to AA from AA+.* Fitch has noted that these
6      changes are the result of revisions Fitch made to its capital model for
        U.S. mortgage insurance companies. Fitch affirmed ratings for PMI
7      Australia and PMI Europe at AA and for The PMI Group, Inc. at A+.
        Fitch's Outlook for The PMI Group, Inc. and related subsidiaries'
8      ratings is Stable.

9      Steve Smith, CEO of The PMI Group, Inc., said, "It is important to
10     recognize that the ratings changes made by Fitch were primarily
       driven by a change in their ratings methodology and capital model,
11     not by a deterioration in the financial position or results of The PMI
       Group, Inc. or our subsidiaries. PMI Mortgage Insurance Co.'s AA
12     ratings from Fitch and Standard and Poor's and Aa2 rating from
       Moody's Investor Services speak to our position as a strong mortgage
13     insurance counterparty for our customers in the U.S. and international
       credit enhancement markets. *PMI Guaranty Co.'s AA rating from*
14     *Fitch, along with AA ratings from Standard and Poor's and Aa3*
15     *ratings from Moody's Investors Services, provides strong ratings*
       *upon which PMI Guaranty can continue to successfully offer*
16     *mezzanine and remote loss credit enhancement solutions for*
       *structured portfolio transactions and capital markets executions."*
17

18     In announcing its ratings changes, Fitch noted a declining U.S.
       residential real estate market and PMI's related exposure and cited
19     PMI's solid franchise, strong balance sheet at the AA rating stress
       level, experienced management team, and high quality insured
20     portfolio as measured by FICO score distribution and other risk
       layering characteristics. Fitch also noted that The PMI Group, Inc.
21     derives benefit from diverse earnings streams from international
       mortgage insurance as well as operations outside of the mortgage
22     insurance space, primarily financial guaranty. [Emphasis added.]

23     29.    On October 18, 2007, the Company issued a press release entitled "The PMI Group,

24  Inc. Announces Housing, Mortgage and Credit Market Conditions to Adversely Affect Third Quarter

25  2007 Financial Results."  Therein, the Company, in relevant part, stated:

26     *As a result of the continued weak housing and mortgage markets*
27     *and associated dislocation in the credit derivative markets, The PMI*
       *Group, Inc. (NYSE: PMI) announced today that it expects to report*
28     *a net loss per basic and diluted share outstanding of approximately*

*$1.05 in the third quarter of 2007. The primary components of the loss are incurred losses in its U.S. Mortgage Insurance Operations and a mark-to-market (or fair value) adjustment at its unconsolidated subsidiary FGIC.*

*The Company's review of the September mortgage default data on its U.S. mortgage insurance portfolio indicates that credit performance significantly worsened during the month and now expects paid claims, loss adjustment expenses and additions to the reserve for losses (collectively "total incurred losses") for its U.S. mortgage insurance operations of approximately $350 million in the third quarter of 2007. As a result, the Company is withdrawing its full year total incurred loss guidance and other financial guidance.*

*Credit conditions also had an adverse effect on the insured credit derivative portfolio of FGIC,* in which PMI is the lead strategic investor, with a common equity ownership of 42.0 percent. FGIC conducted a fair value review of its outstanding credit derivative contracts at September 30, 2007 and estimates that mark-to-market adjustments will result in an unrealized loss of approximately $206 million, pre-tax, in the third quarter of 2007. FGIC anticipates that as a result of this adjustment it will report a net loss for the third quarter of 2007 of approximately $65 million. As a result of PMI's equity ownership in FGIC, PMI will realize an earnings per share loss of $0.32 in the third quarter of 2007 (which amount is included in the estimated third quarter 2007 net loss per share for The PMI Group, Inc. shown above). [Emphasis added.]

30.    That same day, *Bloomberg.com* published an article entitled "PMI Falls on Expected Loss From Borrower Defaults." Therein, the article, in relevant part, stated:

*PMI Group Inc., the second-largest U.S. mortgage insurer, fell the most in 12 years in New York trading, after saying it will have a surprise third-quarter loss as borrower defaults "significantly worsened" in September.*

*The insurer said today it will lose about $1.05 a share in the period and withdrew earnings forecasts for the year, one day after MGIC Investment Corp., the largest mortgage insurer, said it won't be profitable in the fourth quarter or 2008.* MGIC said losses are increasing as housing markets worsen in parts of California and Florida.

*"PMI has the largest Florida exposure of the `big three' mortgage insurers,"* said Seth Glasser, a credit analyst at Barclays Capital Inc., in a note to investors. ``Loss severity in that state must be accelerating quickly."

*The cost of paying claims to mortgage lenders is expected to increase fivefold from the same period a year earlier to about $350 million, Walnut Creek, California-based PMI said in a statement today.* Stagnant home prices make it harder for banks to recover when loans go bad.

*PMI dropped $3.44, or 13 percent, to $23.21 in New York Stock Exchange composite trading, the biggest fall since the company went public in 1995. The company has declined 51 percent this year amid the worst U.S. housing slump in 16 years.*

**Credit-Default Swaps**

MGIC, which posted its first quarterly loss yesterday since it went public in 1991, dropped $2.21, or 8.5 percent, to $23.95. The Milwaukee-based company has lost 62 percent since Dec. 31. Philadelphia-based Radian Group Inc., the third-largest mortgage insurer, fell $1.20, or 6.9 percent, to $16.16 and is down 70 percent this year. Triad Guaranty Inc. is down 83 percent this year. Shares in the Winston-Salem-based insurer fell $3.28, or 26 percent, to $9.29.

Credit-default swaps tied to PMI climbed 40 basis points to 197 basis points, a two-month high, according to CMA Datavision in London. The price of the contracts, used to speculate on the company's ability to repay its debt, means it costs $195,000 to protect $10 million in PMI bonds from default for five years.

"September fell off a cliff in terms of defaults and severity of actual losses," said Geoffrey Dunn, an analyst at KBW Inc. in Hartford Connecticut, who cut the shares to "neutral" last week." It's definitely going to hit earnings and all the mortgage insurers are feeling that pressure."

**More to Come**

*Analysts had forecast PMI would report 78 cents a share profit in the third quarter. The company's estimate includes a 32 cent-a-share loss from the value of PMI's stake in FGIC Corp., Financial Guaranty Insurance Co.'s parent. FGIC said today it lost about $65 million in the third quarter after reducing the value of its insured credit derivative portfolio.*

*"When combined with the downturn in the housing mortgage sector, we believe the volatility at FGIC suggests PMI is in for a prolonged period of stressed financial results,"* Kathleen Shanley, a bond analyst with Gimmie Credit LLC in Chicago, said in a note to investors. Shanley cut her credit rating to "deteriorating" today.

CLASS ACTION COMPLAINT

Transactions tied to credit-default swaps produced an unrealized loss of approximately $206 million before taxes, New York-based FGIC said in a separate statement.

PMI spokeswoman Beth Haiken had no comment. The company will release full financial results for the third quarter before markets open on Oct. 30, it said. [Emphasis added.]

31.    On October 30, 2007, the Company issued a press release entitled "The PMI Group, Inc. Reports Third Quarter 2007 Financial Results." Therein, the Company, in relevant part, stated:

*The PMI Group, Inc. (NYSE: PMI) (the "Company") today reported a net loss for the third quarter of 2007 of $86.8 million, or $1.04 per basic and diluted share. Net income for the third quarter of 2006 was $104.2 million, or $1.16 per diluted share. The net loss for the third quarter of 2007 was primarily due to $348.3 million in paid claims, loss adjustment expenses and additions to the reserve for losses (collectively "Losses and LAE") in the U.S. Mortgage Insurance Operations, and FGIC's negative mark-to-market adjustments on its insured credit derivative portfolio in the Company's Financial Guaranty segment.*

**Highlights include:**

- *U.S. Mortgage Insurance Operations — The net loss was $65.2 million in the third quarter of 2007. During the third quarter, the Company added $253.6 million to the reserves for losses and loss adjustment expenses (LAE) and paid $92.6 million in claims. Total revenues in the third quarter increased by approximately 20% compared to the third quarter of 2006, driven by strong growth in net premiums written and earned. Insurance in force at the end of the third quarter of 2007 was $120.0 billion, representing a 20% increase from one year ago.*

- International Operations—PMI Australia posted net income of $19.7 million on higher premiums earned and net investment income, partially offset by higher losses and LAE. PMI Australia reported solid growth year over year in net premiums written and grew its insurance in force to $182.8 billion. Total losses and LAE increased in the third quarter of 2007 to $21.8 million due primarily to higher claim rates. PMI Europe reported a net loss of $8.4 million, primarily as a result of an unrealized $8.4 million, after tax, negative mark-to-market adjustment on credit default swaps related to European prime mortgage risks due to widening credit spreads. PMI Europe's net premiums written increased

approximately 50% compared with the third quarter of 2006 driven particularly by flow business in Italy. PMI Asia reported net income of $2.9 million fueled by strong growth in reinsurance premiums written and earned compared to the third quarter 2006.

- ***Financial Guaranty — equity in losses from FGIC for the third quarter of 2007 were $28.9 million (pre-tax), as a result of a negative unrealized mark-to-market adjustment in its insured credit derivative portfolio due to widening credit spreads partially offset by strong premium earnings and increased net investment income.***

- Capital Events — The Company repurchased 5,454,381 common shares for approximately $178 million in the third quarter of 2007.

Consolidated Operating Results

Consolidated net premiums written for the third quarter and year to date totaled $276.7 million and $776.8 million, respectively, compared with $212.4 million and $626.1 million for the same periods one year ago. The year over year increases were primarily due to increases in insurance in force from new insurance written, and higher average insured loan balances in the U.S. Mortgage Insurance Operations and an increase in International Operations' net premiums written combined with favorable Australian foreign exchange rates.

Consolidated premiums earned for the third quarter and year to date were $256.8 million and $735.5 million, respectively, compared with $214.9 million and $634.8 million for the same periods one year ago. The increases were due primarily to insurance in force growth, new insurance written, improved persistency and larger loan sizes in the U.S. Mortgage Insurance Operations.

Consolidated losses and LAE for the third quarter and year to date were $372.8 million and $628.3 million, respectively, compared with $79.6 million and $212.4 million for the same periods last year. The increases were primarily a result of higher losses and LAE in the U.S. Mortgage Insurance Operations as a result of an increase in notices of default, increased claim rates and larger claim sizes.

Consolidated reserve for losses and LAE totaled $770.4 million as of September 30, 2007 compared with $507.0 million as of June 30, 2007 and $394.2 million as of September 30, 2006. Reserves for losses and LAE in the U.S. Mortgage Insurance Operations increased $253.6 million in the third quarter of 2007 primarily due to an increase in notices of default, increased claim rates and larger claim sizes. PMI Australia's reserve for losses and LAE increased $7.3

CLASS ACTION COMPLAINT

1
2

million in the third quarter of 2007 principally due to higher claim rates and claim sizes.

3
4
5
6
7
8

Consolidated other underwriting and operating expenses for the third quarter and year to date were $50.6 million and $173.1 million, respectively, compared with $55.9 million and $169.0 million for the same periods one year ago. The decrease in the third quarter of 2007 was primarily the result of lower employee compensation expenses compared to the corresponding period in 2006. The increase in the first nine months of 2007 compared to the corresponding period in 2006 was primarily due to growth in our International Operations and lower share-based compensation expenses in 2006. [Emphasis added, footnotes omitted.]

9       32.     The statements contained in ¶¶ 21-29 and 31 were materially false and misleading

10   when made because defendants failed to disclose or indicate the following: (1) that FGIC had

11   exposure to defaults on mortgage-backed securities and was materially impaired as a result; (2) that

12   the Company failed to properly account for its investment in FGIC and in doing so overstated its

13   financial results; (3) that the Company engaged in improper underwriting practices in its book of

14   business related to insurance; (4) that the Company had far greater exposure to defaults and losses in

15   regard to its book of business related to insurance than it disclosed; (5) that the Company would have

16   to stop writing insurance policies to borrowers, which would have a negative result on future

17   business; (6) that the Company's financial statements were not prepared in accordance with GAAP;

18   (7) that the Company lacked adequate internal and financial controls; and (8) that, as a result of the

19   foregoing, the Company's statements about its financial well-being and future business prospects

20   were lacking in any reasonable basis when made.

21                                   **The Truth Begins to Emerge**

22       33.     On January 8, 2008, The Associated Press published an article entitled "Sector Wrap:

23   Mortgage Insurers."  Therein, the article, in relevant part, stated:

24
25

Fears of accelerating deterioration in the mortgage market sent shares of mortgage insurers lower Tuesday.

26
27

*Lehman Brothers analyst Bruce Harting wrote in research notes MGIC Investment Corp., PMI Group Inc. and Radian Group Inc. will all need to significantly boost reserves for the fourth quarter and beyond to cover expected jumps in insurance claims.*

28

Mortgage insurers cover principal and interest payments on mortgages when borrowers stop paying their loans. As mortgages have increasingly defaulted, the insurers have been forced to pay out more claims on the failed loans. Until defaults dissipate, the insurers will continue to struggle and likely have to build reserves to cover future losses.

*Harting said MGIC, PMI and Radian are all likely to speed up reserve building to cover claims because deterioration in the mortgage market is occurring faster than anticipated.*

Harting increased his fourth-quarter loss estimate for MGIC Investment to a loss of $3 per share from a loss of 91 cents per share because of rising credit costs.

Shares of MGIC fell $3.44, or 17 percent, to $16.06. Earlier in the session, shares hit a 52-week low of $15.71. Shares had traded between $16.22 and $70.10 during the past year.

*Harting estimates PMI Group will now post a loss of $1.58 per share in the fourth quarter, 70 cents per share worse than he had previously forecast.*

*PMI Group shares fell 86 cents, or 7.5 percent, to $10.59. Shares have traded between $9.82 and $51.46 during the past 12 months.*

Harting cut his fourth-quarter estimate for Radian to a loss of $3.50 per share from $2.69 per share.

Shares of Radian Group fell 41 cents, or 4.1 percent, to $9.70. Radian Group shares have traded between $8.15 and $67.35 during the past year. [Emphasis added.]

34. On this news, shares of the stock immediately fell $1.17, or 10.22 percent, to close on January 8, 2008 at $10.28 per share. The shares continued to plunge the following day, falling $1.80 per share, or 17.51 percent, to close on January 9, 2008 at $8.48 per share.

35. On February 11, 2008, the Company filed a Form 8-K with the SEC. Therein, the Company, in relevant part, stated:

As disclosed in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2007, our U.S. mortgage insurer, PMI Mortgage Insurance Co. ("PMI") initiated pricing and underwriting guideline changes in 2007 with respect to, among other loan products, loans with loan to value ratios in excess of 97.00% ("Above 97s"). These pricing and underwriting guideline changes were based upon PMI's review of its portfolio and in response to substantially higher demand for mortgage insurance coverage of Above 97s. As a result of these

changes, the percentage of Above 97s in PMI's new insurance written declined in the fourth quarter of 2007 to 21%, compared to approximately 32% of PMI's primary new insurance written for the full year of 2007.

***Effective March 1, 2008, PMI will institute additional underwriting guideline changes which will, among other things, preclude future mortgage insurance coverage by PMI through its primary flow channel of Above 97s.*** [Emphasis added.]

## The Truth Emerges

36.    On March 3, 2008, after the market closed, the Company shocked investors when it issued a press release entitled, "The PMI Group, Inc. Reports Preliminary Fourth Quarter 2007 Financial Results for Certain Segments." Therein, the Company, in relevant part, stated:

*The PMI Group, Inc. (NYSE: PMI) (the "Company") today announced that due to delays in obtaining 2007 financial results from FGIC Corporation ("FGIC") the Company has filed a Form 12b-25 with the Securities and Exchange Commission ("SEC") for a late filing of its 2007 Form 10-K. In this SEC filing and as outlined below in financial highlights, the Company provides financial results for its U.S. Mortgage Insurance Operations and International Operations and discusses its expectations for its Financial Guaranty segment.* The Company plans to issue its financial results for the fourth quarter of 2007 before the financial markets open (approximately 6:00 AM ET) on Wednesday, March 12, 2008, followed by a conference call at 11:30 AM ET.

*"Our preliminary fourth quarter results for our U.S. Mortgage Insurance and International Operations demonstrate that we are facing challenging market conditions, particularly in the U.S. housing market," said The PMI Group Inc.'s Chairman and CEO Steve Smith. "We have implemented a plan to address these challenges, which we will discuss in detail on our conference call next week. A cornerstone of the plan and our strategic focus going forward is our core business, mortgage insurance, which we believe offers PMI long term opportunities for growth and profitability. Within our Financial Guaranty segment, we will continue to work to stabilize our equity investments in FGIC and RAM Re, but we will not be contributing any additional capital to these companies."*

**Financial Highlights of U.S. and International Mortgage Insurance Operations**

- *U.S. Mortgage Insurance Operations -- reported a net loss of $236.0 million in the fourth quarter of 2007 compared to net income of $77.2 million in the fourth quarter of 2006.*

- 23 -

*The loss in the fourth quarter of 2007 was driven in large part by an increase in losses and loss adjustment expenses resulting from an increase in our default inventory, higher claim rates and higher average claim sizes. For the full year ended December 31, 2007, U.S. Mortgage Insurance Operations reported a net loss of $190.8 million compared to net income of $290.3 million for the full year of 2006. The Company estimates that U.S. Mortgage Insurance Operations' losses and loss adjustment expenses in 2007 were approximately $1.1 billion.*

- International Operations -- reported a net loss of $10.1 million in the fourth quarter of 2007 compared to net income of $20.0 million in the fourth quarter of 2006. Fourth quarter 2007 results were driven primarily by a loss of $29.6 million in PMI Europe as a result of increases in losses and loss adjustment expenses and mark-to-market losses associated with credit default swap derivative contracts, net income of $17.8 million in PMI Australia and net income of $2.9 million in PMI Asia. For the full year ended December 31, 2007, International Operations reported net income of $55.0 million compared to net income of $103.5 million for the full year of 2006.

- Corporate and Other -- reported a net loss of $3.8 million in the fourth quarter of 2007 compared to a net loss of $25.1 million in the fourth quarter of 2006. For the full year ended December 31, 2007, Corporate and Other reported a net loss of $49.5 million compared to a net loss of $71.4 million for the full year of 2006.

**Financial Guaranty Segment**

*Because the Company lacks the necessary financial information from FGIC to complete its consolidated financial statements, the Company is not yet able to calculate its consolidated results of operations for the full year ended 2007 and also is not able to calculate the financial results of its Financial Guaranty segment. The Company expects that its Financial Guaranty segment will report a significant net loss for the fourth quarter of 2007 and the year ended December 31, 2007, driven by equity in losses of FGIC, resulting from unrealized mark-to-market losses and losses and loss adjustment expenses at FGIC during those periods. In connection with the preparation of the Company's consolidated financial statements, the Company is conducting an analysis to determine whether the value of its investment in FGIC was impaired as of December 31, 2007.* This analysis cannot be completed until the Company receives financial information from FGIC necessary for the

1    Company to complete its consolidated financial statements.
     [Emphasis added, footnotes omitted.]

2

3    37.    Also on March 3, 2008, PMI filed a Form 12b-25 with the SEC. Therein, the

4    Company, in relevant part, revealed:

5    *The PMI Group, Inc. (the "Company") is unable to file its Annual*
     *Report on Form 10-K for the year ended December 31, 2007 in a*
6    *timely manner without unreasonable effort and expense in light of*
     *the circumstances described below.*

7
     *The Company is unable to complete its consolidated financial*
8    *statements for the year ended December 31, 2007 because it is*
     *currently awaiting financial information from an equity investee,*
9    *FGIC Corporation ("FGIC"), that is necessary for the Company to*
     *complete its financial statements.* FGIC has informed the Company
10   that it is in the process of completing its financial statements, but that
     it has not been able to do so due to the time and effort involved in
11   determining the amount of loss reserves related to residential
12   mortgage-backed securities and collateralized debt obligations of
     asset-backed securities. The determination of such reserves has been
13   affected by the unprecedented rapid and severe deterioration of the
     residential mortgage market. [Emphasis added.]
14

15   38.    On this news, the Company's shares fell $0.35 per share, or 5.16 percent, to close on

16   March 4, 2008 at $6.43 per share, on unusually heavy trading volume.

17                          **PMI'S VIOLATION OF GAAP RULES**
                            **IN ITS FINANCIAL STATEMENTS**
18                          **FILED WITH THE SEC**

19   39.    These financial statements and the statements about the Company's financial results

20   were false and misleading, as such financial information was not prepared in conformity with

21   GAAP, nor was the financial information a fair presentation of the Company's operations due to the

22   Company's improper accounting for, and disclosure about its revenues, in violation of GAAP rules.

23   40.    GAAP are those principles recognized by the accounting profession as the

24   conventions, rules and procedures necessary to define accepted accounting practice at a particular

25   time. Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC

26   which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

27   Regulation S-X requires that interim financial statements must also comply with GAAP, with the

28   exception that interim financial statements need not include disclosure which would be duplicative

1   of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

2       41.    The fact that PMI will restate its financial statements, and disclosed that these

3   financial statements should not be relied upon is an admission that they were false and misleading

4   when originally issued (APB No.20, ¶¶7-13; SFAS No. 154, ¶25).

5       42.    Given these accounting irregularities, the Company announced financial results that

6   were in violation of GAAP and the following principles:

7           (a)    The principle that "interim financial reporting should be based upon the same

8                  accounting principles and practices used to prepare annual financial

9                  statements" was violated (APB No. 28, ¶10);

10          (b)    The principle that "financial reporting should provide information that is

11                 useful to present to potential investors and creditors and other users in

12                 making rational investment, credit, and similar decisions" was violated

13                 (FASB Statement of Concepts No. 1, ¶34);

14          (c)    The principle that "financial reporting should provide information about the

15                 economic resources of an enterprise, the claims to those resources, and

16                 effects of transactions, events, and circumstances that change resources and

17                 claims to those resources" was violated (FASB Statement of Concepts No. 1,

18                 ¶40);

19          (d)    The principle that "financial reporting should provide information about an

20                 enterprise's financial performance during a period" was violated (FASB

21                 Statement of Concepts No. 1, ¶42);

22          (e)    The principle that "financial reporting should provide information about how

23                 management of an enterprise has discharged its stewardship responsibility to

24                 owners (stockholders) for the use of enterprise resources entrusted to it" was

25                 violated (FASB Statement of Concepts No. 1, ¶50);

26          (f)    The principle that "financial reporting should be reliable in that it represents

27                 what it purports to represent" was violated (FASB Statement of Concepts No.

28                 2, ¶¶ 58-59);

(g) The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79); and

(h) The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, ¶95).

43. The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

44. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased PMI's securities between November 2, 2006 and March 3, 2008, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

45. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PMI's securities were actively traded on the New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PMI or, its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

46. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is

1  complained of herein.

2      47.    Plaintiff will fairly and adequately protect the interests of the members of the Class

3  and has retained counsel competent and experienced in class and securities litigation.

4      48.    Common questions of law and fact exist as to all members of the Class and

5  predominate over any questions solely affecting individual members of the Class. Among the

6  questions of law and fact common to the Class are:

7          (a)    whether the federal securities laws were violated by defendants' acts as

8                 alleged herein;

9          (b)    whether statements made by defendants to the investing public during the

10                Class Period misrepresented material facts about the business, operations and

11                management of PMI; and

12         (c)    to what extent the members of the Class have sustained damages and the

13                proper measure of damages.

14     49.    A class action is superior to all other available methods for the fair and efficient

15  adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

16  damages suffered by individual Class members may be relatively small, the expense and burden of

17  individual litigation make it impossible for members of the Class to individually redress the wrongs

18  done to them. There will be no difficulty in the management of this action as a class action.

19                        **UNDISCLOSED ADVERSE FACTS**

20     50.    The market for PMI's securities was open, well-developed and efficient at all relevant

21  times. As a result of these materially false and misleading statements, and failures to disclose, PMI's

22  securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of

23  the Class purchased or otherwise acquired PMI's securities relying upon the integrity of the market

24  price of PMI's securities and market information relating to PMI, and have been damaged thereby.

25     51.    During the Class Period, defendants materially misled the investing public, thereby

26  inflating the price of PMI's securities, by publicly issuing false and misleading statements and

27  omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not

28  false and misleading. Said statements and omissions were materially false and misleading in that

1 | they failed to disclose material adverse information and misrepresented the truth about the Company,

2 | its business and operations, as alleged herein.

3 |     52.    At all relevant times, the material misrepresentations and omissions particularized in

4 | this Complaint directly or proximately caused or were a substantial contributing cause of the

5 | damages sustained by Plaintiff and other members of the Class.  As described herein, during the

6 | Class Period, defendants made or caused to be made a series of materially false or misleading

7 | statements about PMI's financial well-being, business relationships, and prospects. These material

8 | misstatements and omissions had the cause and effect of creating in the market an unrealistically

9 | positive assessment of PMI and its financial well-being, business relationships, and prospects, thus

10 | causing the Company's securities to be overvalued and artificially inflated at all relevant times.

11 | Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff

12 | and other members of the Class purchasing the Company's securities at artificially inflated prices,

13 | thus causing the damages complained of herein.

14 | **LOSS CAUSATION**

15 |     53.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the

16 | economic loss suffered by Plaintiff and the Class.

17 |     54.    During the Class Period, Plaintiff and the Class purchased PMI's securities at

18 | artificially inflated prices and were damaged thereby.  The price of PMI's securities significantly

19 | declined when the misrepresentations made to the market, and/or the information alleged herein to

20 | have been concealed from the market, and/or the effects thereof, were revealed, causing investors'

21 | losses.

22 | **SCIENTER ALLEGATIONS**

23 |     55.    As alleged herein, defendants acted with scienter in that defendants knew that the

24 | public documents and statements issued or disseminated in the name of the Company were

25 | materially false and misleading; knew that such statements or documents would be issued or

26 | disseminated to the investing public; and knowingly and substantially participated or acquiesced in

27 | the issuance or dissemination of such statements or documents as primary violations of the federal

28 | securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of

information reflecting the true facts regarding PMI, their control over, and/or receipt and/or modification of PMI's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning PMI, participated in the fraudulent scheme alleged herein.

56.     Additionally, during the Class Period, and with the Company's securities trading at artificially inflated prices, Company insiders sold 382,694 shares of the Company's stock for gross proceeds of $18,250,184, including over $7.38 million in gross proceeds received by the Individual Defendants.  This trading by Company insiders is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of Shares | Price per Share | Gross Proceeds |
|---|---|---|---|---|
| May 24, 2007 | Bacigalupi, Victor J. | 1,702 | $49.49 - $49.49 | $84,000 |
| 23-May-07 | Porter, Lloyd Anthony | 2,271 | $49.72 - $49.72 | $113,000 |
| 23-May-07 | Roberts, Daniel L. | 657 | $49.74 - $49.74 | $33,000 |
| 22-May-07 | Rosen, Kenneth T. | 19,500 | $49.91 - $49.96 | $974,000 |
| 18-May-07 | Zech, Ronald H. | 9,000 | $50.06 - $50.06 | $451,000 |
| 11-May-07 | Hedien, Wayne E. | 4,500 | $49.60 - $49.6 | $223,000 |
| 7-May-07 | Katkov, David H. | 9,084 | $48.88 - $48.92 | $444,000 |
| 7-May-07 | Katkov, David H. | 944 | $48.94 - $48.94 | $46,000 |
| 7-May-07 | Katkov, David H. | 405 | $48.88 - $48.88 | $20,000 |
| 4-May-07 | Rosen, Kenneth T. | 4,500 | $48.52 - $48.52 | $218,000 |
| 1-May-07 | Smith, L. Stephen | 13,900 | $48.09 - $48.09 | $668,000 |

CLASS ACTION COMPLAINT

| 1-May-07 | Shuster, Bradley M. | 653 | $47.85 - $47.85 | $31,000 |
|---|---|---|---|---|
| 1-May-07 | Shuster, Bradley M. | 31,586 | $48.02 - $48.3 | $1,521,000 |
| 20-Apr-07 | Smith, L. Stephen | 19,892 | $48 - $48 | $955,000 |
| 19-Apr-07 | Smith, L. Stephen | 108 | $48 - $48 | $5,184 |
| 16-Apr-07 | Smith, L. Stephen | 10,000 | $46 - $46 | $460,000 |
| 1-Mar-07 | Smith, L. Stephen | 10,000 | $46.06 - $46.42 | $462,000 |
| 12-Feb-07 | Katkov, David H. | 449 | $47.34 - $47.34 | $21,000 |
| 6-Feb-07 | Bacigalupi, Victor J. | 3,129 | $51 - $51.1 | $160,000 |
| 6-Feb-07 | Haughton, W. Roger | 10,000 | $50.31 - $50.31 | $503,000 |
| 6-Feb-07 | Roach, John D. | 10,000 | $50.58 - $50.58 | $506,000 |
| 6-Feb-07 | Berkowitz, Joanne Margaret | 1,352 | $50.09 - $50.09 | $68,000 |
| 6-Feb-07 | Smith, L. Stephen | 2,821 | $50.49 - $50.49 | $142,000 |
| 6-Feb-07 | Smith, L. Stephen | 16,100 | $51.07 - $51.07 | $822,000 |
| 2-Feb-07 | Smith, L. Stephen | 30,000 | $48.19 - $48.19 | $1,446,000 |
| 10-Jan-07 | Jeter, Thomas Harrison | 629 | $47.04 - $47.04 | $30,000 |
| 3-Jan-07 | Smith, L. Stephen | 30,000 | $48.06 - $48.06 | $1,442,000 |

CLASS ACTION COMPLAINT

| Date | Name | Shares | Price Range | Total |
|---|---|---|---|---|
| 15-Dec-06 | Bacigalupi, Victor J. | 28,974 | $47.60 - $47.6 | $1,379,000 |
| 11-Dec-06 | Roach, John D. | 12,000 | $46.06 - $46.06 | $553,000 |
| 8-Dec-06 | Berkowitz, Joanne Margaret | 28,724 | $46.87 - $46.87 | $1,346,000 |
| 8-Dec-06 | Berkowitz, Joanne Margaret | 8,559 | $46.91 - $46.91 | $402,000 |
| 8-Dec-06 | Berkowitz, Joanne Margaret | 1,604 | $46.80 - $46.8 | $75,000 |
| 8-Dec-06 | Shuster, Bradley M. | 2,592 | $46.69 - $46.69 | $121,000 |
| 7-Dec-06 | Smith, L. Stephen | 10,000 | $46.81 - $46.81 | $468,000 |
| 7-Dec-06 | Shuster, Bradley M. | 8,921 | $46.73 - $46.73 | $417,000 |
| 28-Nov-06 | Bacigalupi, Victor J. | 550 | $42.92 - $42.92 | $24,000 |
| 14-Nov-06 | Castle, James C. | 18,750 | $42.99 - $42.99 | $806,000 |
| 14-Nov-06 | Bacigalupi, Victor J. | 4,500 | $43.11 - $43.11 | $194,000 |
| 13-Nov-06 | Bacigalupi, Victor J. | 13,628 | $42.99 - $42.99 | $586,000 |
| 6-Nov-06 | Bacigalupi, Victor J. | 710 | $43.13 - $43.13 | $31,000 |
| **TOTAL:** | | **382,694** | | **$18,250,184** |

### Applicability of Presumption of Reliance:
### Fraud On The Market Doctrine

57.    At all relevant times, the market for PMI's securities was an efficient market for the

CLASS ACTION COMPLAINT

1  following reasons, among others:

2          (a)    PMI's securities met the requirements for listing, and were listed and actively

3                 traded on the NYSE, a highly efficient and automated market;

4          (b)    As a regulated issuer, PMI filed periodic public reports with the SEC and the

5                 NYSE;

6          (c)    PMI regularly communicated with public investors via established market

7                 communication mechanisms, including through regular disseminations of

8                 press releases on the national circuits of major newswire services and through

9                 other wide-ranging public disclosures, such as communications with the

10                 financial press and other similar reporting services; and

11          (d)    PMI was followed by several securities analysts employed by major

12                 brokerage firms who wrote reports which were distributed to the sales force

13                 and certain customers of their respective brokerage firms.  Each of these

14                 reports was publicly available and entered the public marketplace.

15          58.    As a result of the foregoing, the market for PMI's securities promptly digested current

16  information regarding PMI from all publicly-available sources and reflected such information in the

17  price of PMI's securities.  Under these circumstances, all purchasers of PMI's securities during the

18  Class Period suffered similar injury through their purchase of PMI's securities at artificially inflated

19  prices and a presumption of reliance applies.

20                                  **NO SAFE HARBOR**

21          59.    The statutory safe harbor provided for forward-looking statements under certain

22  circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

23  Many of the specific statements pleaded herein were not identified as "forward-looking statements"

24  when made.  To the extent there were any forward-looking statements, there were no meaningful

25  cautionary statements identifying important factors that could cause actual results to differ materially

26  from those in the purportedly forward-looking statements.  Alternatively, to the extent that the

27  statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are

28  liable for those false forward-looking statements because at the time each of those forward-looking

1 | statements was made, the particular speaker knew that the particular forward-looking statement was

2 | false, and/or the forward-looking statement was authorized and/or approved by an executive officer

3 | of PMI who knew that those statements were false when made.

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

60.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase PMI's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

62.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for PMI's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

63.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about PMI's financial well-being, business relationships, and prospects, as specified herein.

64.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of PMI's value and performance and

1  continued substantial growth, which included the making of, or the participation in the making of,
2  untrue statements of material facts and omitting to state material facts necessary in order to make the
3  statements made about PMI and its business operations and future prospects in light of the
4  circumstances under which they were made, not misleading, as set forth more particularly herein,
5  and engaged in transactions, practices and a course of business which operated as a fraud and deceit
6  upon the purchasers of PMI's securities during the Class Period.

7        65.    Each of the Individual Defendants' primary liability, and controlling person liability,
8  arises from the following facts: (i) the Individual Defendants were high-level executives and/or
9  directors at the Company during the Class Period and members of the Company's management team
10  or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities
11  as a senior officer and/or director of the Company, was privy to and participated in the creation,
12  development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii)
13  each of these defendants enjoyed significant personal contact and familiarity with the other
14  defendants and was advised of, and had access to, other members of the Company's management
15  team, internal reports and other data and information about the Company's finances, operations, and
16  sales at all relevant times; and (iv) each of these defendants was aware of the Company's
17  dissemination of information to the investing public which they knew or recklessly disregarded was
18  materially false and misleading.

19        66.    The defendants had actual knowledge of the misrepresentations and omissions of
20  material facts set forth herein, or acted with reckless disregard for the truth in that they failed to
21  ascertain and to disclose such facts, even though such facts were available to them. Such defendants'
22  material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose
23  and effect of concealing PMI's financial well-being, business relationships, and prospects from the
24  investing public and supporting the artificially inflated price of its securities. As demonstrated by
25  defendants' overstatements and misstatements of the Company's financial well-being, business
26  relationships, and prospects throughout the Class Period, defendants, if they did not have actual
27  knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such
28  knowledge by deliberately refraining from taking those steps necessary to discover whether those

1  statements were false or misleading.

2      67.    As a result of the dissemination of the materially false and misleading information
3  and failure to disclose material facts, as set forth above, the market price of PMI's securities was
4  artificially inflated during the Class Period.  In ignorance of the fact that market prices of PMI's
5  securities were artificially inflated, and relying directly or indirectly on the false and misleading
6  statements made by defendants, or upon the integrity of the market in which the securities trades,
7  and/or in the absence of material adverse information that was known to or recklessly disregarded by
8  defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff
9  and the other members of the Class acquired PMI's securities during the Class Period at artificially
10  high prices and were damaged thereby.

11      68.    At the time of said misrepresentations and omissions, Plaintiff and other members of
12  the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other
13  members of the Class and the marketplace known the truth regarding the problems that PMI was
14  experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class
15  would not have purchased or otherwise acquired their PMI securities, or, if they had acquired such
16  securities during the Class Period, they would not have done so at the artificially inflated prices
17  which they paid.

18      69.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange
19  Act and Rule 10b-5 promulgated thereunder.

20      70.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the
21  other members of the Class suffered damages in connection with their respective purchases and sales
22  of the Company's securities during the Class Period.

23

24

25

26

27

28

## SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

71.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

72.    The Individual Defendants acted as controlling persons of PMI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

73.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

74.    As set forth above, PMI and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the

1        Federal Rules of Civil Procedure;

2    (b)    Awarding compensatory damages in favor of Plaintiff and the other Class

3        members against all defendants, jointly and severally, for all damages

4        sustained as a result of defendants' wrongdoing, in an amount to be proven at

5        trial, including interest thereon;

6    (c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred

7        in this action, including counsel fees and expert fees; and

8    (d)    Such other and further relief as the Court may deem just and proper.

9                    **JURY TRIAL DEMANDED**

10    Plaintiff hereby demands a trial by jury.

11

12

13    Dated: April 3, 2008            SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP

14

15                    Alan R. Plutzik, Of Counsel (Bar No. 077758)
                    L. Timothy Fisher, Of Counsel (Bar No. 191626)
16                    2125 Oak Grove Road, Suite 120
                    Walnut Creek, CA 94598
17                    Telephone: (925) 945-0770
                    Facsimile: (925) 945-8792
18

19                    - and -

20                    Richard A. Maniskas
                    rmaniskas@sbtklaw.com
21                    D. Seamus Kaskela
                    skaskela@sbtklaw.com
22                    David M. Promisloff
                    dpromisloff@sbtklaw.com
23                    280 King of Prussia Road
                    Radnor, PA 19087
24                    Telephone: (610) 667-7706
                    Facsimile: (610) 667-7056
25

26

27

28

CLASS ACTION COMPLAINT

## CERTIFICATION

I, Kimberly D. Holt ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the Complaint, and authorizes its filing.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's purchase and sale transaction(s) in The PMI Group, Inc. (NYSE: PMI) security that is the subject of this action during the Class Period is/are as follows:

| Type of Security (common stock, preferred, option, or bond) | Number of Shares | Bought (B) | Sold (S) | Date | Price per share |
|---|---|---|---|---|---|
| Common Stock | 6.1869 | (B) | | 8/21/07 | $31.68 |
| Common Stock | 6.0662 | (B) | | 9/4/07 | $32.31 |
| | | | | | |
| | | | | | |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

5.    Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as described below: _____

7.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27 day of March , 2008

KIMBERLY D. HOLT